UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

PATRICK MEYER,

      Plaintiff,

      v.

WEXFORD HEALTH SOURCES,

      Defendant.

Case No. 3:16-cv-00173-JPG-DGW

**MEMORANDUM AND ORDER**

**J. PHIL GILBERT, DISTRICT JUDGE**

Patrick Meyer filed this Eighth Amendment suit against Wexford Health Sources, arguing that Wexford's policy to treat inmates at the prison as often as possible instead of sending the inmates to a more expensive outside specialist constitutes cruel and unusual punishment. Wexford moved for summary judgment, and then Magistrate Judge Wilkerson issued a Report & Recommendation that advises this Court to deny Wexford's motion. (ECF Nos. 101, 108.) The Court respectfully disagrees, **REJECTS** the Report & Recommendation, and **GRANTS** Wexford's motion for summary judgment.

I.      **BACKGROUND**

The facts of this case are mostly undisputed. On April 1, 2015—when Patrick Meyer was a prisoner at Robinson Correctional Center—he fainted and hit his face on the floor, leading to a broken jaw and several facial fractures. (Def.'s Mot. Summ. J., Ex. A, ECF No. 102-1, pp. 9–10.) The prison immediately sent Meyer by ambulance to Crawford Hospital, where Meyer received an EKG; a CT scan of his brain, facial bones, and spine; a chest x-ray; and blood work. (*Id.* at 4.) Crawford Hospital then transferred Meyer to Carle Foundation Hospital, where Meyer received surgery to correct his broken jaw, another MRI, and a neurosurgery consult. (*Id.* at 5–8.) The

1

hospital discharged Meyer a few days later, along with a list of instructions: Meyer was to take a number of medications; have a follow-up appointment with his oral/maxillofacial surgeon at the hospital; receive another x-ray; and have another follow-up appointment with the neurosurgery team at the hospital regarding his newly diagnosed "severe cervical stenosis"—a narrowing of the spinal canal that may cause numbness, weakness, tingling, and/or pain. (Def.'s Mot. Summ. J., Ex. B, ECF No. 102-2 at 60–65; Shah Dep. 27:14–20, ECF No. 102-3.)

When Meyer got back to Robinson, he spent a few weeks in the infirmary: from April 3 until roughly the end of the month. (*Id.* at 1, 31.) Meyer interacted with prison medical staff on a daily basis at that point, which included several follow-up appointments with his primary care physician; two follow-up chest x-rays; numerous physical examinations; medication; and more. (*Id.* at 139–69.) At one point, Meyer complained of pain in his jaw and ribs, so a doctor at the infirmary ordered another x-ray to rule out any more broken bones. (Shah Dep. 77:7–24, ECF No. 102-3.) And then in May, after the prison infirmary discharged Meyer, they twice sent him back to Carle Foundation Hospital for follow-up appointments with his oral/maxillofacial surgeon. (*Id.* at 317-318; 327-328; ECF No. 102-1, pp. 9–12.)

The problem in this case is that the prison doctors never sent Meyer back to Carle Foundation Hospital for a follow-up appointment with the neurosurgery team regarding his cervical stenosis. The prison doctor—Dr. Vipinchandra Shah—stated that he believed that the follow-up appointment was unnecessary because Meyer never complained of any symptoms associated with cervical stenosis, despite having daily encounters with medical staff during his stay at the infirmary for most of April. (Shah Dep., ECF No. 102-3 at 27:14–20.) Meyer admits that he did not complain of any stenosis-related symptoms to Dr. Shah. (Meyer Dep. 49:9–12, ECF No. 104-2.) But this is where the disputed facts come in: Meyer did testify, however, that

after his discharge from the infirmary at the end of April, he told a nurse at sick call "at least three" times about pain in his neck—but Meyer does not identify whom those nurses were or on which dates those complaints occurred. (*Id*. at 48:5–24.) Meyer also said that he told a prison doctor "at some point" that he needed to see a neurosurgeon, though again, there is no indication of who that doctor is or when that complaint occurred. (*Id.* at 74:4–10; ECF No. 104, p. 4.) Either way, Meyer's medical records reflect no such complaints.

Regardless, Meyer ended up filing this lawsuit against Wexford Health Sources—the corporation that runs the prison medical program—on the theory Wexford itself was deliberately indifferent to Meyer's serious medical needs when they did not send Meyer for his neurosurgical follow-up appointment at an outside hospital. Meyer believes that the doctors and nurses at Robinson refused to send Meyer back to Carle Foundation Hospital for the appointment because Wexford has a policy to try to treat all prisoners at their respective prisons in order to save costs. Wexford has now moved for summary judgment on the merits. (ECF No. 101.)

## II.     LEGAL STANDARDS

### A.      Summary Judgment

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

### B.    Reports and Recommendations

The Court may accept, reject, or modify—in whole or in part—the findings or recommendations of the magistrate judge in a report and recommendation. FED. R. CIV. P. 72(b)(3). The Court must review *de novo* the portions of the report to which objections are made. *Id.* "If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error." *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999). Here, Wexford has objected to nearly all of the Report, so the Court has conducted a full *de novo* review.

### III.    ANALYSIS

Meyer's theory against Wexford is unsuccessful for a number of reasons. Meyer must prove that a "Wexford policy, practice, or custom caused a constitutional violation." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016); *Monell v. Department of Social Services*, 436 U.S. 658

(1978). But if there is no underlying constitutional violation, then Wexford is not liable for anything. *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) ("Wexford cannot be held liable for damages because there is no underlying constitutional violation."); *Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015). So here, Meyer must show that a Wexford policy caused the prison medical professionals to be deliberately indifferent to Meyer's medical needs—a showing that he has failed to make because (1) no medical professional was deliberately indifferent here; and (2) even if someone was deliberately indifferent, there is no evidence that a Wexford policy motivated such a thing.

### A.    Deliberate Indifference

The Eighth Amendment's prohibition on the unnecessary and wanton infliction of pain forbids deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006). To prevail on such an Eighth Amendment claim, a prisoner must show (1) that he had an objectively serious medical need; and (2) that the official knew that the medical need was serious and presented a substantial risk of harm, but disregarded it. *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Johnson*, 444 F.3d at 584. The second prong is a particularly difficult burden for a plaintiff: he must show that the defendant's conduct was intentional or reckless; neither simple nor gross negligence is sufficient to establish deliberate indifference. *Burton v. Downey,* 805 F.3d 776, 784 (7th Cir. 2015); *Johnson*, 444 F.3d at 585; *Salazar v. City of Chi.*, 940 F.2d 233, 238 (7th Cir. 1991).

Deliberate indifference can arise in a few ways. For example, it can arise if a medical professional fails to provide prompt treatment for the need. *Chapman v. Keltner*, 241 F.3d 842, 845-46 (7th Cir. 2001) (citing *Estelle*, 429 U.S. at 104-05). It can also arise when a treatment decision was "blatantly inappropriate." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)

(quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). A "blatantly inappropriate" decision is one that is "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014*)* (internal citation omitted). A prison physician's failure to refer an inmate to a specialist does not constitute deliberate indifference, however, as long as the choice (1) involved the exercise of medical discretion; and (2) was not blatantly inappropriate. *Pyles*, 771 at 411.

Here, there is no evidence that any prison medical officials intentionally or recklessly ignored Meyer's cervical stenosis. First, in regards to Meyer's time at the prison infirmary, Meyer spent several weeks there with Dr. Shah and the rest of the crew—but never once complained about any symptoms related to cervical stenosis. (Shah Dep. 27:14–20, ECF No. 102-3.) And Meyer admits to that. (Meyer Dep. 49:9–12, ECF No. 104-2.) The problem here, however, is a bit more nuanced: Meyer's discharge papers from Carle Foundation Hospital state that he should have a follow-up appointment with the neurosurgery team there—meaning that Dr. Shah was nevertheless on notice of Meyer's condition. So the question here becomes whether Dr. Shah—after seeing that recommendation—intentionally or recklessly made a blatantly inappropriate decision not to send Meyer for a follow-up appointment. *Pyles*, 771 at 411.

Even viewing the evidence in the light most favorable to Meyer, no reasonable jury could find that Dr. Shah was deliberately indifferent here. Instead, the record in this case clearly indicates that Dr. Shah—knowing that Meyer made no complaints about any symptoms related to cervical stenosis—exercised his medical discretion and believed that another appointment with the neurosurgery team was not necessary. Specifically, Dr. Shah testified:

**Q.** Okay. Did you inform Mr. Meyer that you had decided not to have him -- have him have a neurosurgical consult?

**[DR. SHAH] A.** No.

**Q.** Why not?

**A.** He never complained.

**Q.** No, no, no.

**A.** [Carle Foundation Hospital's finding] was an incidental finding. [Meyer] never complained about any neck pain, any related spinal stenosis, you know, that -- any arm pain, any numbness, tingling, muscle pain. This was just -- according to me, this was just an incidental finding that [Carle Foundation Hospital] reviewed at that time, and it had no clinical significance.

[…]

[B]ut if [Meyer] had pain that [was] significant, I would have believed he would have complained during his two- or three-year stay, because he was here in 2018. He has never complained of neck pain, arm pain, stiffness, numbness, tingling. All he's -- you can review all his chart from 2015 that this happened. His main concern was the jaw. Our main concern was with the jaw, because he was not able to eat, swallow, talk. The pain was severe. So we wanted to make sure his jaw is fixed, and he's able to eat normally, talk normally, swallow normally.

(Shah Dep., ECF No. 102-3 at 27:14–20.)

Meyer combats that testimony by making sweeping arguments like "Dr. Shah's distinction that he chose not to send Meyer for a neurosurgical followup based on his clinical judgment and not based on how much things cost, or a [Wexford] policy is misplaced: Dr. Shah does not have to know how things are paid to be aware that Wexford wants their physicians to treat everyone at the correctional center to keep costs down." (ECF No. 104, p. 9.) But that argument begs the question and ignores whether Dr. Shah was deliberately indifferent to Meyer's medical needs: specifically, whether Dr. Shah made a blatantly inappropriate medical decision not to send Meyer for a neurosurgery follow-up. *Pyles*, 771 at 411. No reasonable jury could look at this record and find that Dr. Shah made a blatantly inappropriate medical decision here:

declining to send a patient for an outside-consult regarding a condition that causes numbness, stiffness, and associated pain—when that patient has never complained about numbness, stiffness, and associated pain—is certainly a decision that a "minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). Dr. Shah was not deliberately indifferent, and there is no evidence in the record that he was motivated by something other than his own clinical judgment.

The other issues here are Meyer's alleged statements to the unnamed medical personnel after he left the infirmary. At his deposition, he testified that (1) he told a nurse at sick-call at least three times that he was experiencing symptoms relating to cervical stenosis; and (2) he told a doctor at some point that he needed a neurosurgery follow-up appointment at the hospital. (Meyer Dep. 49:9–12, 48:5–24, ECF No. 104-2.) The problem for Meyer is that none of his medical records reflect any of these complaints, and he has not given any names, dates, or any clues whatsoever as to whom these nurses and doctor are. Again, a genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. And here, all Meyer has entered into the record are metaphysical doubts as to whether he ever made these statements, and without even a single identifiable name to go by, no reasonable jury could find for Meyer on these grounds. *Anderson*, 477 U.S. at 252.

## B.    Monell Liability

Meyer's claim against Wexford fails for a second reason. Even if Meyer could show that a medical professional was deliberately indifferent to his cervical stenosis, the record is devoid

of any evidence that a policy, practice, or custom of Wexford caused such a violation. *Chatham*, 839 F.3d at 685 (7th Cir. 2016). Wexford's corporate representative testified that "[o]ur client (State of Illinois) expects us to do as much care as we can on-site and to use consultations with discretion . . . when it's medically necessary, when it's reasonable to do this." (Fisher Dep., 104-3 at 120.) But there is absolutely zero evidence that that policy motivated Dr. Shah or any other unnamed doctor or nurse to decline to send Meyer for a follow-up appointment at Carle Foundation Hospital. Meyer asserts that Dr. Shah and company must have refused to send Meyer to the hospital for another neurosurgery follow-up appointment simply because they were "employed by Wexford and required to follow Wexford's policies." That is a logical fallacy: the policy does not ban doctors from sending prisoners to outside specialist, so asserting that the policy must have been the moving force behind the medical staff's decision *only* because they work for Wexford does not make much sense.

Instead, the record in this case neuters that theory very quickly: as soon as Meyer fainted and broke his jaw on April 1, the prison sent him to Crawford Hospital and Carle Foundation Hospital, where Meyer received a wealth of treatment. Meyer remained at Carle Foundation Hospital until April 3, when they discharged him back to the prison. Meyer then stayed at the prison infirmary until the end of April, and after he was discharged, the medical staff sent him back to Carle Foundation Hospital *twice* during the month of May for follow-up appointments with his oral/maxillofacial surgeon. (ECF No. 102-3. at 317-318; 327-328; ECF No. 102-1, pp. 9–12.) To be frank, Meyer's theory that Wexford maintains an unconstitutional policy that prevents him from receiving treatment at an outside hospital—at the very same time that Wexford is sending Meyer to outside hospitals over and over again for treatment—borders on frivolous. There was no cruel and unusual punishment here.

## CONCLUSION

For the foregoing reasons, the Court **REJECTS** the Report & Recommendation (ECF No. 108), **GRANTS** Wexford's motion for summary judgment (ECF No. 101), **DISMISSES** this case **WITH PREJUDICE**, **FINDS AS MOOT** any other pending motions, and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  OCTOBER 29, 2018**

> **s/ *J. Phil Gilbert***
> **J. PHIL GILBERT**
> **DISTRICT JUDGE**